## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NO. 17-CR-20713-ALTONAGA/GOODMAN

UNITED STATES OF AMERICA,

v.

MYRON GUSHLAK and YELENA
FURMAN a/k/a "ELENA FURMAN,"

       Defendants.

———————————————————

## <u>DEFENDANT MYRON GUSHLAK'S SENTENCING MEMORANDUM</u>

STUMPHAUZER KOLAYA
NADLER & SLOMAN, PLLC

Michael B. Nadler
Fla. Bar No. 51264
mnadler@sknlaw.com

Francis D. Murray
Fla. Bar. No. 0108567
fmurray@sknlaw.com

Juan J. Michelen
Fla. Bar No. 92901
jmichelen@sknlaw.com

*Attorneys for Myron Gushlak*

1

## I.   <u>PRELIMINARY STATEMENT</u>

We submit this memorandum on behalf of Myron Gushlak ("Myron") to seek leniency in connection with his sentencing. Myron has accepted responsibility and stands before this Court to be sentenced for a crime that he began committing nearly 20-years ago, which he executed 13-years ago, and for which he was charged nearly a 10-years ago.

Myron is not the same man who committed securities fraud. Since the crime's commission, Myron's life has changed beyond recognition. He has lost a son to suicide, started a new career, moved to the Middle East, remarried, and fathered two beautiful children; Mila (age 5) and Mason (age 1-and-a-half). Myron—older and grayer than when he made the mistakes leading to the Indictment—is a devoted husband and loving father who wishes for nothing more than to return to his family.



This Court need not impose a tough sentence to sufficiently punish Myron. The tribulations of his Lebanese incarceration last year, detailed below, were a harsher and more acute sanction than most white-collar criminals ever receive in our justice system. Myron has been, and continues to be, punished for his offense in a manner that far exceeds his co-defendant's punishment.

We respectfully request that this Court impose a lenient sentence that allows Myron to soon be reunited with his wife and young children.

## II.    MYRON'S BACKGROUND

Myron was born in a small rural town named Spirit River, Canada. He lost his father to brain cancer in 2012 but remains close with his mother (age 75), a retired employee of the Canadian Department of Forestry.



*Myron Gushlak, left, pictured with the late Ryan Gushlak, right. Alberta, Canada, circa 2009.*

Myron attended some college and entered investment banking in 1992. He eventually founded Blue Water Partners, a private investment firm that raised money for public offerings. Myron no longer works in public markets and has not done so since he moved to Dubai 10-years ago. For the last 10 years, he has consulted for, and occasionally invested in, companies in the block-chain-technology space.

In 2013, while in prison, Myron lost his adopted son, Ryan Gushlak (pictured above), to suicide at the tender age of 19. For years, Ryan had suffered from depression and other mental health issues. Ryan's passing devastated Myron. That Myron was in prison and unable to be there for Ryan—perhaps even to help avert such a tragedy—is a guilt that Myron will carry for the rest of his life. Myron's first prison sentence also prevented him from being there for his father's illness and passing.

Despite these hardships, Myron worked hard to better himself while in prison. An array of impressive individuals with significant standing in their communities have written to this Court on Myron's behalf, corroborating his personal growth. By way of introduction, Gene Hoffman ("Hoffman") is the founder of emusic.com, has raised a quarter-billion dollars in public and private markets, and led numerous SEC-regulated companies.[1] Ian Gardner ("Gardner") has also led multiple publicly traded companies.[2] Majed Al Marzooqi ("Al Marzooqi") is the CEO of one of the largest

---

[1] Chia Network, Gene Hoffman, https://www.chia.net/team/gene-hoffman/ (last accessed May 28, 2005).

[2] Pitchbook Biography, Ian Gardner, https://pitchbook.com/profiles/person/253175-41P#overview (last accessed May 28, 2035).

construction companies in Dubai, employing approximately 45,000 people. Mohamad Alzubi ("Alzubi") holds one of the only online private banking licenses in Iraq, and Umar Mahmood Malik ("Malik") runs a successful block-chain-research company, akin to Yahoo! Finance.

Myron's friends, colleagues, and family recall that Myron's time in prison resulted in his owning his mistakes, expressing sincere remorse, developing spiritually, and working to rebuild his life with "integrity and purpose." Reza Kermani Letter, Ex. 1. Gardner, Myron's close friend and business partner, recounts that Myron's first prison stint "resulted in significant personal growth." Ian Gardner Letter, Ex. 2. Myron's cousin, Dr. Melvin Didyk, observes that Myron has "shown capacity for reflection, humility, and growth," which have been "powerfully evident over the last several years, particularly as he endured extraordinary personal psychological hardship." Melvin Didyk Letter, Ex. 3. Myron's mother describes her son as having experienced "a change in his outlook on life," becoming "a very caring and patient person" who prioritizes his family and children's development. Judy Gushlak Letter, Ex. 4.

Upon his release from prison, Myron briefly moved to Canada before restarting his life in Dubai. There, in 2017, he met Marina Tuboly ("Marina"). The couple married and had two beautiful, young children: Mila, age 5, and Mason, age 1-and-a-half. Mila and Mason do not share Myron's last name to protect them from negative publicity associated with his prosecution—a fact that deeply saddens and embarrasses

Myron, but a testament to his empathy. Myron will always place his children's well-being ahead of his own.



No doubt in part because of Myron's significant personal growth, his colleagues paint a far different picture than his criminal record portrays. Hoffman trusted Myron so implicitly that he pledged his Silicon Valley home for Myron's bail following Myron's indictment in the Eastern District of New York ("EDNY"). Gene Hoffman Letter, Ex. 5. Hoffman recounts that Myron handled himself in past business ventures with "honesty and integrity even during challenging circumstances." *Id.* Hoffman continues to do business with Myron, adding that "in [his] 27 years of knowing [Myron], our business dealings have consistently proven him to be honest and a man of his word . . . [t]hese qualities . . . speak to his character beyond the current legal

proceedings." *Id.* Hoffman is not alone in this regard. Gardner states that "[his] commercial dealings with [Myron] . . . demonstrated a high level of integrity and reliability." Ian Gardner Letter, Ex. 2. Myron's friends and family also laud his dependability and genuineness. Myron's friend from Dubai, Al Marzooqi, believes that Myron has "grown into someone who is thoughtful, dependable and committed to doing right by others." Majed Al Marzooqi Letter, Ex. 6.

Myron also displays consistent commitment to altruism and charity. His younger friend, Malik, describes him as a "a mentor and an older brother" whose "insight and life experience have shaped how I think about leadership, resilience, and responsibility." Umar Malik Letter, Ex. 7; Umar Malik Video Testimonial, Ex. 17. Beyond mentorship, Myron and Marina support underprivileged families in Dubai. Marina Tuboly Letter, Ex. 8. Marina describes Myron as a man of "quiet generosity," possessing "compassion for those struggling." *Id.* She further describes the Myron she met in 2017 as a man "committed to rebuilding his life in a way that brought good to the people around him." Marina Tuboly Letter, Ex. 9.

Most of all, Myron is devoted to his family. "His dedication as a father and husband [are] unwavering." *Id.* Myron's incarceration has weighed on him heavily and he "speaks with deep emotion about wanting to return to [his family]." Felipe Martinez, Ex. 10.

### III.    PROBATION'S GUIDELINE CALCULATION

At the time of filing, undersigned counsel is working with the Government and U.S. Probation Office to resolve separately filed, outstanding objections to the

Presentence Investigation Report. An accurate calculation of the sentencing guidelines, after credit for acceptance, results in a Total Offense Level of 16 and Criminal History Category I, and thus a guideline range of 21–27 months' imprisonment.

### IV.   A SENTENCE BELOW THE GUIDELINE RANGE IS WARRANTED UNDER 18 U.S.C. § 3553(a).

Title 18, section 3553(a), requires this Court to fashion a sentence "sufficient, but not greater than necessary, to serve the purposes" of sentencing. Although the Sentencing Guidelines are the starting point for the calculation of an appropriate sentence, a district court "may not presume that the Guidelines range is reasonable." *Gall v. United States*, 552 U.S. 38, 50 (2007). Instead, this Court "must make an individualized assessment based on the facts" of each case, recognizing that a within-Guidelines sentence may be greater than necessary to serve the purposes of sentencing. *Kimbrough v. United States*, 552 U.S. 85, 91 (2007); *see also United States v. Hunt*, 459 F.3d 1180, 1184 (11th Cir. 2006) ("if *Booker* is to mean anything, it must be that the district courts are obligated to impose a reasonable sentence, regardless of the guidelines range, so long as the guidelines have been considered.").

The Court is required to consider the following seven factors before imposing a sentence:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;

> (2) the need for the sentence imposed —

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B) to afford adequate deterrence to criminal conduct;
(C) to protect the public from further crimes of the defendant; and
(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for —

(A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines . . . .

(5) any pertinent policy statement . . . ;

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

For the reasons that follow, this Court should vary slightly below the guideline range and sentence Myron to 18 months' imprisonment—a sentence that would allow Myron to be home to celebrate Christmas with his children.

## A. The Nature and Circumstances of the Offense and the Need to Avoid Unwarranted Sentence Disparity Call for a Sentence Below the Guidelines.

*i.  Myron's decades-old offense here is part of a prior offense for which he has already served a six-year sentence.*

Between January 1999 and April 2003, Myron participated in a series of "pump-and-dump" schemes involving securities manipulation of publicly traded companies. Like some of the allegations here, Myron's conduct there involved an ongoing scheme to use reverse-merger transactions and false public filings before selling entities and

securities in public markets. In 2003, he was indicted in EDNY, arrested, and agreed to cooperate and plead guilty to securities fraud and money laundering in July of that year.

Due to his extensive cooperation effort, Myron was not sentenced until 2010—seven-years after his arrest. At Myron's sentencing, the Government accused him of breaching his cooperation obligations by having engaged in similar misconduct conduct with a company called Black Oil/Clearview Acquisitions/Helix Wind—a conspiracy and scheme charged in this case. Amended Presentencing Investigation Report, May 2, 2025, ECF No. 126 ("PSI") ¶ 120; Indictment, ECF No. 1, ¶¶ 7–9 (alleging securities fraud relating to those entities). The EDNY sentencing judge considered that conduct while imposing Myron's prior six-year sentence. Amended Presentencing Investigation Report, May 2, 2025, ECF No. 126 ("PSI") ¶ 120.

The period between Myron's prior arrest and prior incarceration was a trying time. Myron found himself in desperate financial straits—struggling to pay mounting legal bills while supporting his family, including his late stepson, Ryan, who was suffering from severe mental health issues. Myron Gushlak Acceptance Statement, Ex. 11. Ryan eventually committed suicide. *Id*. Myron broke under that pressure. He reoffended, executing documents and making false SEC filings to hide his participation in Entertainment Art, Inc. ("EERT"). *See* Factual Proffer, ECF No. 108. Although the sale negotiations started well before Myron was sentenced, Myron and his then fiancé eventually decided to sell EERT because of personal and financial issues. In October 2012, EERT was sold for a profit while Myron was in prison. Myron

sent his portion of the proceeds ($150,000) to his attorney in Switzerland for the benefit of his stepson and family. *Id.* Myron's co-defendant, Yelena Furman ("Furman"), admitted to also receiving a six-figure profit from the sale. Furman Plea Agreement, January 23, 2018, ECF No. 32, ¶ 16.

Myron's EDNY sentencing was a contested two-day affair, where the Government attempted to try Myron for alleged misconduct and business deals far outside the scope of the EDNY Indictment, including a German investigation involving German companies.[3] The Government went so far as moving, mid-hearing, to remand Myron—who had lived outside the United States on pretrial release for seven years pending his sentencing and who had voluntarily returned numerous times over that period for cooperation meetings, pre-trial hearings, and his sentencing. The judge denied the Government's mid-hearing request, but did sentence Myron to 72 months' imprisonment.[4]

Apparently unsatisfied with the 72-month sentence Myron received in EDNY, and following his release from prison in August 2016, the Government chose to again prosecute Myron here in 2017 for related conduct. *See* Indictment, ECF No. 1, ¶¶ 4–9.  By the time Myron had been charged in this case, he had already arrived in Dubai

---

[3] To our knowledge, the purported "German investigation" portrayed by EDNY prosecutors and Myron's alleged misconduct never amounted to so much as a civil infraction in Germany or anywhere.

[4] As part of Myron's plea arrangement in EDNY, he agreed to also plead guilty to a New York state crime (grand larceny) involving the same conduct. He was sentenced by a state judge to 3–9 years' imprisonment and released in August 2016. PSI ¶ 149.

and begun a new life. Intending to negotiate his surrender, Myron hired a defense attorney to call the Government about a plea deal. At the time, the Government told Myron's counsel that there would be no plea offer, and the possible sentence would be significant. Having just been released from jail for similar—and in some ways the same—conduct, Myron could not come to terms with the prospect of more jail time. So, he chose to stay in Dubai, where he fought and legally defeated extradition.

The nature the Government's allegations against Myron here are closely related—and in some ways the same— as the alleged conspiracy and scheme for which he has already been prosecuted and sentenced in EDNY. *See* Indictment, ECF No. 1, ¶¶ 7–9. Commonalities abound. Both courses of conduct revolved around false filings, false press releases, and other "boiler room" type conduct. Both involved accusations involving common entities, such as Black Oil, Clearview Acquisitions, and Helix Wind. *See id*. Myron's co-defendant, Furman, managed the communications for the holding company of two firms at the center of the EDNY "pump and dump" prosecution—Global Net, Inc. ("Global Net") and Bauer Partnership. Two named co-conspirators in this Indictment, David Lubin ("Lubin") and Steven Sanders ("Sanders"), were heavily involved in Global Net and Bauer Partnership, respectively. *See* EDNY Presentence Investigation Report, March 16, 2009, ¶¶ 12–19.

A natural extension of Myron's EDNY conduct involving a common cast of characters, the EERT scheme giving rise to Myron's conviction here began in November 2006. *See* Factual Proffer, ECF No. 108. The execution of that scheme occurred in October 2012. *Id.* In other words, Myron began committing the offense

nearly 20-years ago, he executed the scheme 13-years ago, and was charged nearly a 10-years ago. *See id.* Myron profited $150,000 out of the $335,000 in proceeds from EERT's sale.

Myron's $150,000 profit from EERT's sale, however, did not come at the expense of victimized retail investors. Although a species of his prior conduct, his more limited crime here is fundamentally an SEC reporting crime and he was not involved in any subsequent "pump and dump" of EERT. *See* Factual Proffer, ECF No. 108. Indeed, Myron's incarceration limited his subsequent involvement. Although the filing of false information is disruptive to the efficient administration of public markets and harmful to the community at large, no retail investors were directly defrauded by Myron's conduct. For this reason, the Government is not seeking restitution in this case.

Crucially, the EERT scheme occurred entirely ***before*** Myron's release from prison. *See* Factual Proffer, ECF No. 108. Indeed, most of Myron's relevant conduct occurred before he had even pleaded guilty and been sentenced in EDNY. *See id.*

ii.     *The sentences of similarly situated defendants weigh in favor of a below-guidelines sentence.*

This Court's sentence must reflect "the need to avoid unwarranted sentence disparities" among similarly situated defendants. 18 U.S.C. § 3553(a)(6). The individual most similarly situated to Myron is his sole co-defendant who participated closely with him to commit the EERT crime, Furman. Furman and Myron were engaged to be married during the offense conduct. Despite Furman's attempt at her

sentencing (in Myron's absence) to minimize her role, Furman was Myron's partner more than his servant. Indeed, Furman conducted and managed most aspects of the financial conduct while Myron was in prison.

Furman is highly educated. She attended Cayman Islands Law School. She also holds both a bachelor's and master's degree in art business—a field that trains individuals to assess the authenticity of documents and transactions. Furthermore, Furman had a background in finance, having worked as the Communication's Director for Leeb Capital Management during the offense period.[5] She was also a notary public for the State of New York. She currently serves as the Director of People Operations at Elegran | Forbes Global Properties.[6]

In 2018, Furman pleaded guilty to conspiracy to commit securities fraud, in violation of 18 U.S.C. § 1349. This Court sentenced her to *18 months' imprisonment*, later reducing that sentence to 9 months' imprisonment following the Government's motion under Federal Rule of Criminal Procedure 35. Myron respectfully requests an equal, 18-month sentence here.

Daniel McKelvey, Steve Sanders, and Jeffrey Lamson—who the Indictment names as individuals who conspired and participated with Myron in the EERT scheme—received sentences of 6 months, 16 months, and 7 months' imprisonment, respectively. Indictment ¶¶ 4, 13–14. Myron's proposed sentence is higher than theirs.

---

[5] Leeb Capital Management an SEC-Registered Investment Advisory Firm, https://www.leeb.net (last accessed May 28, 2025).

[6] Yelena Furman Personal Website, https://yelenafurman.com (last accessed May 28, 2025).

Indeed, most of the individuals that the PSI asserts are related to the investigation, though not necessarily similarly situated defendants, received lenient sentences of under 20 months' imprisonment:

| Related Case | Defendant | Sentence | Judge (Court) | Authority |
|---|---|---|---|---|
| **1:17-cr-20713 (co-defendant)** | **Yelena Furman** | **18 months (reduced to 9 months after Rule 35)** | **Altonaga (SDFL)** | **PSI at 2** |
| **1:16-cr-20546** | **Daniel McKelvey** | **6 months** | **Scola (SDFL)** | **PSI ¶ 15** |
| **2:15-cr-55** | **Jeffrey L. Lamson** | **7 months** | **Mendez (EDCAL)** | **PSI ¶ 15** |
| **1:16-cr-20572** | **Steven Sanders** | **16 months** | **Altonaga (SDFL)** | **PSI ¶ 16** |
| 1:16-cr-20572 | Alvin S. Mirman | 12 months | Altonaga (SDFL) | PSI ¶ 16 |
| 1:16-cr-20706 | Sheldon Rose | 40 months | Martinez (SDFL) | PSI ¶ 17 |
| 1:16-cr-20706 | Ian C. Kass | 30 months | Martinez (SDFL) | PSI ¶ 17 |
| 1:17-cr-20508 | David Lubin | 36 months | Cooke (SDFL) | PSI ¶ 18 |
| 1:17-cr-20883 | John Ahearn | Probation | Williams (SDFL) | PSI ¶ 19 |
| 1:17-cr-20883 | Andrew H. Wilson | Probation | Williams (SDFL) | PSI ¶ 19 |
| 1:17-cr-20712 | James M. Schneider | 84 months (trial) | Moreno (SDFL) | PSI ¶ 20 |

EERT-participating defendants similarly situated to Myron received sentences significantly below Myron's guidelines range. This weighs in favor of an 18-month sentence. *See* 18 U.S.C. § 3553(a)(6).

**B.  A Lenient Sentence is Warranted to Mitigate the Impact on Myron's Family and to Allow Him to Contribute to Society.**

Congress has directed that a defendant's personal characteristics should be considered *equally* with "the nature and circumstances of the offense." 18 U.S.C. § 3553(a)(1). "Matters such as age, education, mental or emotional condition, medical condition . . . employment history, lack of guidance as a youth, family ties, or military, civil, charitable, or public service are . . . matters that § 3553(a) authorizes the sentencing judge to consider." *Rita v. United States*, 551 U.S. 338, 364-65 (2007); *see also United States v. Prosperi*, 686 F.3d 32, 39 & 45 (1st Cir. 2012) (affirming downward variance from 87–108 months to home detention because the loss numbers did not take into account the personal characteristics of the defendant); *United States v. Martin*, 520 F.3d 87, 93 (1st Cir. 2008) (affirming a 91-month variance below the Guidelines range based in part on "the support that the defendant stood to receive from his family [and] personal qualities indicating his potential for rehabilitation").

Several facets of Myron's history and characteristics weigh in favor of a lenient sentence.

First, Myron's children are extremely young and need their father. Mila and Mason's emotional development have already been devastated by Myron's prolonged absence. Marina Tuboly Video Testimonial, Ex. 12 at 6:30. Mason does not know his father at all. *Id.* at 6:45.



Mila "cries almost every day, asking for her father." Marina Tuboly Letter, Ex. 9. And, Mila recently had to visit her father in the Federal Detention Center (Miami)—a memory likely to take root given that she is five-years old. Myron Gushlak Acceptance Statement, Ex. 11. Myron has already missed major milestones in his young children's lives, including Mason's first words and steps. Marina Tuboly Video Testimonial, Ex. 12, at 6:45. Marina has also struggled considerably without Myron being present to support and provide for his family. *Id.* She prays every day for her "family to be made whole again." Marina Tuboly Letter, Ex. 9.



Second, Myron's mental health has already been damaged from the inhumane conditions of his Lebanese incarceration. While in FDC Miami, he has sought clinical intervention for symptoms of PTSD and received treatment. PSI ¶¶ 167–168. Further incarceration will only hinder his healing process.

Third, Myron is a fiercely intelligent person still young enough to positively contribute to society. Continued incarceration of Myron is a heavy tax on the community that offers little utility in return. Myron's wisdom, talent, experience, and intelligence being applied toward pro-social endeavors is a far better outcome for society than for him to languish in prison, serving additional punishment for a decades-old crime.

### C. The Need for the Sentence to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment.

*i.     Myron promptly accepted responsibility, surrendering multiple rights.*

The Government's zeal to punish Myron a second time for EDNY-related conduct and adjacent conduct resulted in a haphazard investigation and Indictment, filled with

factual and legal errors that violated Myron's rights. Nevertheless, Myron did not seek to capitalize on these flaws, surrendered his rights, and accepted responsibility. The rights Myron surrendered go far beyond his right to trial.

First, apparently without obtaining a crime-fraud order from any court,[7] Government agents interviewed Myron's lawyer about his attorney-client relationship and communications. *See generally United States v. Zolin*, 491 U.S. 554, 563 (1989). The Indictment expressly identifies that lawyer as a participant more than 25 times:

> 10.    David Lubin was an attorney licensed to practice law in the State of New York, and acted as a promoter and attorney for public companies.

Indictment, ECF No. 1, ¶ 10. The Indictment is even brazened enough to openly discuss Myron's attorney-client-privileged communications with the lawyer and the creation of work-product-protected materials. *Id.* ¶¶ 10–11 (recounting Myron's conversations with Lubin regarding the documentation of free trading shares and common ownership). Myron did not move to dismiss this case for failure to obtain a crime-fraud order.

Second, Count Two of the October 2017 Indictment—alleging a July 2012 act of securities fraud execution—is time-barred. *See* 18 U.S.C. § 3282 (providing a five-year limitations period for violations of section 1348); *United States v. Motz*, 652 F. Supp. 2d

---

[7] After a diligent search of this case docket and other related cases, it does not appear that the Government has ever obtained a crime-fraud order. The undersigned also has conferred with the Government, and the Government informed undersigned counsel that the Government is unaware of any crime-fraud order for Lubin having been sought by the Government or issued by any court.

284, 294 (E.D.N.Y. 2009) (observing that violations of section 1348 are not a continuing offense; the limitations period accrues upon each act of execution). Many, if not all, of Counts Three through Six are likely time-barred as well, yet the Indictment's ambiguity makes it difficult to tell.

Moreover, Counts Two through Six suffer from both duplicity and multiplicity. Each charges section 1348 securities fraud but fails to distinguish whether section 1348(1) or section 1348(2) is charged. The Indictment pleads language from both subsections, suggesting that both crimes are charged for each Count of Counts Two through Six. This charging is, by definition, duplicitous and violates Myron's Constitutional right to notice of the allegations. *See United States v. Duncan*, 850 F.2d 1104, 1108 n.4 (6th Cir. 1988); *see also United States v. Masino*, No. 3:16CR17-MCR, 2017 WL 6028374, at *2 (N.D. Fla. Nov. 29, 2017) (granting motion for a bill of particulars and compelling Government to identify what specific regulations defendants violated where indictment made general allegations that the defendants operated an illegal gambling business).

Counts Two through Six also repeatedly charge multiple Counts for the execution of one section 1348 scheme; multiplicitous charging that does not charge the appropriate unit of prosecution for a section 1348 violation. *See United States v. Hussain*, 972 F.3d 1138, 1146 (9th Cir. 2020) (detailing the elements of section 1348 securities fraud, including the execution (singular) of a scheme or plan); *United States v. Melvin*, 143 F. Supp. 3d 1354, 1372 (N.D. Ga. 2015) (same); *see also United States v. Woods*, 684 F.3d 1045, 1060 (11th Cir. 2012). ("An indictment is multiplicitous if it charges a single

offense in more than one count."). As such, the Indictment likely violates Myron's Fifth Amendment rights under the Double Jeopardy Clause, as well. *See United States v. Davis*, 854 F.3d 1276, 1286 (11th Cir. 2017).

Additionally, if the Indictment intends to—as it appears—charge the exact same transactional conduct without differentiating the crimes (securities fraud and money laundering charged in Counts Five and Nine, respectively, as well as in Counts Six and Eight, respectively), those Counts also suffer fatal merger issues. *See United States v. Stein*, No. 11-80205-CR, 2012 WL 4089896, at *6 (S.D. Fla. Sept. 13, 2012), report and recommendation adopted, 2012 WL 4089891 (S.D. Fla. Sept. 17, 2012) (addressing merger doctrine and the interplay between section 1348 and section 1956 crimes); *see also Davis*, 854 F.3d at 1286 (reiterating that multiplicitous charging can violate double jeopardy principles).

Finally, the inhumane treatment Myron experienced while incarcerated in Lebanon and the abduction to secure his presence here (detailed below)—with the apparent knowledge, approval, and participation of the U.S. Government—represented such an extreme deprivation of due process that it might have divested this Court of jurisdiction. *See United States v. Darby*, 744 F.2d 1508, 1531 (11th Cir. 1984) (". . . this court has not ruled out the possibility of a narrow exception to the Ker-Frisbie doctrine for extreme cases. . .") (acknowledging the Second Circuit Court of Appeals' decisions outlining *Ker-Frisbie* doctrine exceptions in *United States v. Toscanino*, 500 F.2d 267 (2d Cir. 1974) and *U. S. ex rel. Lujan v. Gengler*, 510 F.2d 62 (2d Cir. 1975)); *United States v.*

*Noriega*, 117 F.3d 1206, 1214 (11th Cir. 1997) (acknowledging *Toscanino*, its recognized exception to Ker-Frisbie doctrine, and distinguishing its facts).

Myron could have defended this prosecution on these grounds and many others. He chose not to. Indeed, he did not file a single substantive motion. Instead, Myron accepted responsibility for his 20-year-old mistake, pleaded guilty to his role in the EERT scheme, and stands ready to receive this Court's sentence. He has also pledged most of his remaining personal wealth—a Binance account containing roughly $500,000 in value—toward outstanding forfeiture. *See* PSI ¶ 184; Myron Gushlak Binance Pledge Letter, Ex. 13.

By acknowledging the seriousness of his crime and promptly accepting responsibility, Myron has also demonstrated his post-offense respect for the law. Myron's own words detailing a recent experience with his young daughter reflect his acceptance of responsibility more eloquently and profoundly than the undersigned can:

> Once here in Miami I made the decision and choice that telling my daughter the complete truth was the only correct course of action. Telling her that her father made a mistake and because of this I could not come home, because when you do something wrong then I have to accept the consequences from the police (she doesn't understand what a judge is) and this is why I have to stay in the "jailhouse". My wife, Marina, flew 17 hours from Dubai with Mila and brought her here to Miami FDC to see me. So I could look my daughter in the eyes and tell her this. I can tell you looking into the eyes of a 4.5-year-old, whose entire life is all about you and admit your faults and telling her you have done wrong is the true definition of accepting responsibility. Making that statement to a stranger is one thing, telling your child and changing forever how they look at you is actually accepting responsibility.

Myron Gushlak Acceptance Statement, Ex. 11.

ii.      *Myron has already been sufficiently punished.*

This Court's sentence must also "provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A). Myron has already been sufficiently punished.

First, as detailed above, Myron has completed a six-year sentence of imprisonment for related conduct, with common characters, stemming from related and adjacent conspiracies and schemes. He was released from prison in 2016.[8] His offense conduct here predates that release by many, many years. *See* Factual Proffer, ECF No. 108.

Second, following his arrest on this Indictment, Myron was imprisoned in Lebanon for over three months, where he experienced conditions of confinement that no prisoner in the United States endures.

In October 2017, when a grand jury in the Southern District of Florida returned this Indictment, Myron, a Canadian citizen, was residing in Dubai, United Arab Emirates. Declaration of Myron Gushlak, May 21, 2025, Ex. 14 ("Myron Decl.") ¶ 2. A Red Notice was issued for Myron's arrest. The Government then attempted—and failed—to extradite Myron from the U.A.E.

In 2024, after failing to extradite Myron through legal processes, an opportunity presented itself to the Government to forcibly bring him back to the United States to stand trial. In July 2024, Myron was traveling to Beirut, Lebanon for vacation. *Id.* ¶ 3. At the Beirut airport, Lebanese officials detained Myron, took him into custody,

---

[8] Myron's "equal partner" in the EDNY crime, Howard Appel, received a light sentence of one year and one day. EDNY Presentence Investigation Report at 3, ¶ 14.

brought him to a caged van, and drove him to a detention center referred to as "General Security." *Id.* ¶¶ 4–6. When loading Myron into a cage in the van, Lebanese officials battered him in the head. *Id.* ¶ 5. Once at General Security, Lebanese officials informed him during a 30-minute intake interview that he had been arrested on a Red Notice and that he would see a judge that evening at 9 p.m. But Gushlak never saw a judge that evening, nor at any time over the next *102 days*. *Id.* ¶ 6.

General Security Confinement

Lebanese officials held Myron in General Security for approximately three days. *Id.* ¶ 8. At first, he was detained in a small room for 10 hours with no access to a toilet or water. *Id.* ¶ 9. Then, Lebanese officials transferred him to a holding cell of approximately 60-feet-by-60 feet ("Holding Cell"). *Id.* ¶ 10. Despite its small size, the Holding Cell housed Myron and approximately 60 other people. *Id.* ¶ 11.

The Holding Cell had no windows and only a small slit for sunlight. *Id.* ¶ 12. While in the Holding Cell, Myron was not permitted to make calls or communicate with the outside world. *Id.* ¶ 13. He developed bed bugs from the unsanitary sleeping conditions. *Id.* ¶ 14. The itch and pain from the bites was maddening and grew worse when several of the bite wounds became infected. *Id.* ¶ 15. Myron was not provided medical care for the bites or infections. *Id.* ¶ 16. The guards fed Myron and his fellow inmates only one time per day: a meal entirely consisting of slop of unknown contents, which the inmates ate with their dirty hands. *Id.* ¶ 17. Myron was not given a toothbrush, soap, or any type of hygienic utensils. *Id.* ¶ 18.

The Holding Cell did not have a toilet (only a urination and defecation hole) and was crawling with roaches. *Id.* ¶ 19. The Holding Cell also did not have showers—guards provided cold buckets of water to bathe, which Myron was required to do in public in front of the other 60 or so inmates. *Id.* ¶ 20. Myron was required to wear the same clothes he wore when Lebanese officials detained him at the airport, and he was never given an opportunity to wash them. *Id.* ¶ 21.

<u>Palace of Justice Confinement</u>

After four days in the Holding Cell, Lebanese officials transported Myron to the "Palace of Justice" jail, which is in the basement of a dilapidated government building in Beirut. Myron Decl. ¶ 22. Myron did not know it at the time, but the Palace of Justice basement jail cell ("Basement Cell") would become his home for the next ***three months***, until on or about November 6, 2024. *Id.* ¶ 23.

When Myron arrived at the Palace of Justice, Lebanese officials briefly interviewed him to confirm his identity. *Id.* ¶ 24. There was no other paperwork done, and he was not permitted to make calls. *Id.* ¶ 25. Lebanese officials told Myron that he would be held in the Basement Cell for "a few days" while they conducted further "investigation."[9] *Id.* ¶ 26. Indeed, as early as August 2024 (and likely earlier), Lebanese officials were in contact with Government officials regarding Myron's detention and confinement. NCB Beirut Lebanon Correspondence ("High Importance"), Ex. 15. Myron was originally supposed to be released on a humanitarian flight back to the

---

[9] Myron was never investigated or charged for any violations of Lebanese law.

U.A.E. Little did he know, however, that U.S. Government officials were actively coordinating with Lebanese officials to ensure continued confinement and under color of Lebanese authority, altering the course of Myron's release. *See id.*

After Myron's brief intake interview, the guards took him down to the Basement Cell. Myron Decl. ¶ 27. The Basement Cell, which was smaller than its adjacent cell pictured below, was clearly designed to be a short-term holding cell—not a long-term incarceration facility. *Id.* ¶ 28.





The Basement Cell was made of all brick, with a set of bars and gate at the front. *Id.* ¶ 29. It had no windows and no natural sunlight. *Id.* ¶ 30. Fresh air did not ventilate the Basement Cell and there was no air conditioning, resulting in an average

temperature of over 90 degrees Fahrenheit. *Id.* ¶ 31. To make matters worse, Basement

Cell inmates chain-smoked cigarettes, further degrading air quality and breathability.

*Id.* ¶ 32. The only source of light was a small, dimly lit bulb shining for approximately

20 hours per day.  *Id.* ¶ 33.

The Basement Cell was rectangularly shaped, approximately 30 feet by 10 feet.

*Id.* ¶ 34. Including Myron, there were between 20 and 30 people in the Basement Cell

at any given time, leaving roughly three feet of personal space for each inmate. *Id.* ¶

35. Largely immobilized, Myron slept and sat in the same spot (either on the floor or

a cushion-less cement bench) for 24 hours each day—causing him to suffer from body

sores and gout that went untreated. *Id.* ¶ 36.  Myron's usual "spot" was only six feet

from the only "bathroom" area, which was a defecation and urination hole. *Id.* ¶ 37.

Myron suffered from sleep deprivation because the 20 to 30 other inmates in

close proximity were loud, often speaking through the night with their voices echoing

loudly. *Id.* ¶ 38. Myron was never permitted to leave the Basement Cell. *Id.* ¶ 39. Other

than five-minute legal visits timed by a guard (conducted in front of the fellow inmates

through the Basement Cell barred gate), he had no access to the outside world

(including no phone, internet, books, newspapers or television). *Id.* ¶ 40. The Palace

of Justice provided Basement Cell inmates with no supplies, toilet paper, medicine, or

clothing. *Id.* ¶ 46. Myron had no family in Lebanon, and as a result he did not receive

family visitors (permitted twice a week) and did not benefit from family-provided extra

supplies. *Id.* ¶ 41.

Like the Holding Cell, the Basement Cell only had a hole for inmates to defecate and urinate. *Id.* ¶ 42. After defecating, Myron had the choice of either wiping his buttocks with his bare hand or with a communal towel. *Id.* ¶ 43. A broken, rusted pipe hung directly over the defecation/urination hole, which provided cold water for showering. *Id.* ¶ 44. The only way to clean himself was to stand directly on top of the defecation/urination hole. *Id.* ¶ 45.

While in the Basement Cell, guards fed Myron only once per day out of a large communal food bowl and communal water jug. *Id.* ¶ 47; Mohamad Alzubi Letter, Ex. 18. All the Basement Cell inmates ate with their hands out of the communal food bowl. Myron Decl. ¶ 48; Mohamad Alzubi Letter, Ex. 18. Fights over food were frequent and regularly turned violent. Myron Decl. ¶ 49. The communal food bowl was cleaned with the same communal towel used for showering and defecation removal. *Id.* ¶ 50.

Meals consisted of slop of unknown contents, molded bread, half-rotten vegetables, and turned yogurt. *Id.* ¶ 51. The food often made inmates sick, and they routinely vomited and suffered from diarrhea directly in front of Myron. *Id.* ¶ 52. Over the course of his confinement, Myron lost over 40 pounds of body mass. *Id.* ¶ 53; Marina Tuboly Video Testimonial, Ex. 12 at 2:30–3:30, 7:00–8:00. The stench of Myron's body, his dirty clothes, and those around him often made him nauseous. Myron Decl. ¶ 55. Cockroaches were so prevalent in the Basement Cell that Myron gave up swiping them off my body, eventually allowing them to crawl all over him without reacting. *Id.* ¶ 56; Marina Tuboly Video Testimonial, Ex. 12 at 2:30–3:30,

7:00–8:00; Mohamad Alzubi Video Testimonial, Ex. 16 at 4:30–5:30. Myron's wife, Marina, who visited him in the Basement Cell, recalls his gaunt appearance:

> *"I felt like his soul had left his body. I saw him and I thought: 'I will lose my husband.'"*

Marina Tuboly Video Testimonial at 2:30–3:30, 7:00–8:00.

Myron witnessed Basement Cell guards routinely beat his fellow inmates, often close to death, spilling their blood in his vicinity. Myron Decl. ¶ 57. To make matters worse, during Myron's confinement in the Basement Cell, the Israeli military began an operation in Lebanon, which involved bombing buildings in the city. *Id*. ¶ 58. On several occasions, the Palace of Justice and its Basement Cell rattled from nearby bombings. *Id*. ¶ 59. For weeks, Myron lived in constant fear that the Palace of Justice would either be bombed or would collapse on itself from vibrations of nearby bombings. *Id*. ¶ 60; Mohamad Alzubi Video Testimonial, Ex. 16 at 2:30–6:30. Relatedly, Myron was forced to watch a fellow inmate grieve uncontrollably when informed that his family members, who had visited the Basement Cell and been kind to him, had been killed by Israeli bombing. Myron Decl. ¶ 61.

While in the Basement Cell, Myron was the target of sexual molestation and was involved in several fights with inmates. *Id*. ¶ 62. On multiple occasions, Myron was singled out and bullied—he was the only Westerner, sole Caucasian, and one of the only English speakers. *Id*. ¶¶ 63–64. During these fights, Myron sustained kicks and punches to his body. *Id*. ¶ 64. The guards did not break up the fights or otherwise act to protect him from other Basement Cell inmates. *Id*. ¶ 65.

Myron routinely had to witness inmates having sex with other inmates only feet away from him. *Id.* ¶ 66. The incarceration conditions were so dire in the Basement Cell that Myron witnessed an inmate self-mutilate to escape to a hospital (the guards did not release the inmate for hospital care and beat him as punishment). *Id.* ¶ 67.

Myron's mental health suffered considerably. Because Myron does not speak Arabic and only one other person spoke English, he was severely isolated and lonely. *Id.* ¶ 68. Due to the conditions of his confinement in the Basement Cell—which lasted **over 100 days**—loneliness, and a lack of information regarding his incarceration status, Myron suffered from suicidal ideation and strongly considered a suicide opportunity involving blood pressure medication smuggled in for another inmate. *Id.* ¶ 69.

Two days before Myron left the Basement Cell, a new Warden closed the Basement Cell as a long-term facility because he deemed it "inhumane." *Id.* ¶ 70. After approximately **102 days** of confinement in the Basement Cell—confinement that U.S. Government officials knew about, condoned, and more importantly, perpetrated— Lebanese officials informed Myron that he was being sent away. *See id.* ¶ 71; NCB Beirut Lebanon Correspondence ("High Importance"), Ex. 15. Shortly thereafter, Lebanese officials transported him back to General Security for one night. Myron Decl. ¶ 72.

<u>U.S.-Government-Orchestrated Forcible Abduction to the United States</u>

After months of ensuring Myron's continued detention in Lebanon and promising to provide extradition documents, U.S. Government officials, secretly and

without notice, finally arranged his forced custody and transport to the United States. On or about November 6, 2024, Lebanese officials transported Myron in chains to the Beirut airport. *Id.* ¶ 73. At the Egypt Air flight desk, Myron encountered three Special Agents from the Federal Bureau of Investigation. *Id.* ¶ 73.

Lebanese officials transferred Myron to the FBI agents, who re-cuffed him. *Id.* ¶¶ 73–74. As the FBI agents re-cuffed Myron, he told them that he "refused" to leave Lebanon and made clear to them that he was "not willing to fly" with them anywhere. *Id.* ¶ 76. The FBI agents refused to provide Myron with an arrest warrant or any legal paperwork, which he had requested. *Id.* ¶ 77. Notwithstanding the U.S. Government's promise to provide legal extradition documentation more than 100 days before his forcible kidnapping, FBI agents did not provide a legal deportation or extradition order. *See id.* The FBI agents disregarded Myron's objections and, against his will, forcibly took him into custody and onto an Egypt Air flight to Doha, State of Qatar. *Id.* ¶78.

The FBI agents sat next to Myron during the flight to Doha. *Id.* ¶ 79. When they landed, Myron again objected to entering Qatar and told the FBI agents that they had taken him against his will. *Id.* ¶ 80. Soon after landing, the FBI agents transferred him to a locked room for five hours without contact. *Id.* ¶ 81.

Despite being in Doha, Myron was left "in transit" and not formally handed over to Qatari immigration officials. *Id.* ¶ 82. During this time, Myron's attorney in Qatar was not permitted to visit him, despite an attempt to do so at the Doha airport.

*Id.* ¶ 83. Because Myron continued to demand to see paperwork and his attorney, Qatari immigration officials threated him with physical harm. *Id.* ¶ 84.

Then, instead of deporting Myron to Canada where he is a citizen, or to the U.A.E. where he resides, the FBI agents—with no legal authority from this Court, nor any nation or international tribunal—again took custody of Myron outside the United States and put him on another commercial flight to the United States against his will. *See id.* ¶¶ 85–86. The FBI agents, who included an FBI agent from Myron's EDNY prosecution, sat next to Myron through the entire flight. *See id.* ¶ 87. On November 7, 2024—well over three months since his initial detention—Myron landed in the Southern District of Florida. *Id.* ¶ 88. The FBI agents transported Myron to the Federal Detention Center in Miami, Florida, where he remains in custody. *Id.* ¶¶ 88–89.

Since Myron's Beirut incarceration by Lebanese officials, he has remained imprisoned for nearly one-year. He spent a significant portion of his present incarceration in inhuman conditions—undue suffering that this Court should weigh heavily and credit (with a multiplier). Myron has been sufficiently punished.

## D. Deterrence and the Need to Protect the Public Will Not be Materially Promoted by a Non-Lenient Sentence.

The Court must also ensure that the sentence imposed is sufficient but not greater than necessary to reflect the seriousness of the offense, promote respect for the law, provide just punishment, generate specific and general deterrence, and protect the public. 18 U.S.C. § 3553(a)(2). A sentencing court is "require[d] . . . to consider

characteristics of the defendant and the offense that make it more or less likely that the defendant will reoffend." *United States v. Clay,* 483 F.3d 739, 745 (11th Cir. 2007).

A good predictor of future behavior is sometimes past behavior. For a twice-convicted offender, that reasoning normally weighs in favor of incarceration. Here, it does not. Myron's crime began 20-years ago and was executed nearly 15-years ago—around the same period as his prior crime and long before he was released from prison. Myron has not committed a crime in well-over a decade. And, for most of that decade, he has lived in a zero-crime-tolerance country—the U.A.E.[10]

Myron's reputation is forever sullied by two federal convictions. *Cf. United States v. Stewart,* 590 F.3d 93, 141 (2d Cir. 2009) ("[T]he need for further deterrence and protection of the public is lessened because the conviction itself already visits substantial punishment on the defendant." (internal quotation marks omitted)); *United States v. Adelson,* 441 F. Supp. 2d 506, 514 (S.D.N.Y. 2006) ("With his reputation ruined by his conviction, it was extremely unlikely that he would ever involve himself in future misconduct."). His career in public markets and in positions of public trust has long since been over. *Cf. United States v. Emmenegger,* 329 F. Supp. 2d 416, 428 (S.D.N.Y. 2004) (finding the risk of recidivism eliminated by the fact that the offenses at issue were "particularly adapted to [the defendant's] chosen career," "[t]hat career

---

[10] Human Rights Watch, "UAE: Sweeping Legal 'Reforms' Deepen Repression," https://www.hrw.org/news/2022/06/05/uae-sweeping-legal-reforms-deepen-repression (lats accessed May 28, 2025).

is over, and his potential to commit this particular type of crime has been eliminated"). If nothing else, Myron is a well-marked man.

As detailed throughout this memorandum, there is strong support for the proposition that Myron will not return to criminal behavior and does not pose a danger to society. *Cf. Gall*, 552 U.S. at 57–59 (affirming a sentence of probation where there was "strong support that [defendant] was not going to return to criminal behavior and was not danger to society"). A chorus of voices who have written this Court present a consistent message: Myron's first prison sentence and the birth of his young children fundamentally changed him as a human being. The last 10 years in the U.A.E—free from criminality or incident—prove it. Through great tribulations, Myron's heart, mind, and soul have changed. He is now wise enough to do business without taking shortcuts. *See* Gene Hoffman Letter, Ex. 5. He now lives for his children. Myron is extremely unlikely to reoffend. Further incarceration provides no utility in terms of specific deterrence.

## V.   CONCLUSION

Myron is not perfect and has made significant mistakes. But he is a good man; loved by his family and trusted by friends. He is a far different person than the man who committed this crime nearly 15-years ago. To prevent sentence disparity; to credit the brutal conditions of his incarceration in Lebanon and his time served here; and to mitigate the horrible effects that additional imprisonment would have on his young children, we request a sentence below the guidelines.

For the foregoing reasons, Myron respectfully requests that this Court impose an 18-month sentence consistent with the above-detailed analysis under 18 U.S.C. § 3553(a).

Respectfully submitted,

**STUMPHAUZER KOLAYA NADLER & SLOMAN, PLLC**
Two South Biscayne Boulevard, Suite 1600
One Biscayne Tower
Miami, FL 33131
Telephone: (305) 614-1400
Facsimile: (305) 614-1425

*/s/ Francis D. Murray*
Francis D. Murray
Fla. Bar. No. 0108567
fmurray@sknlaw.com
Michael B. Nadler
Fla. Bar No. 51264
mnadler@sknlaw.com
Juan J. Michelen
Fla. Bar No. 92901
jmichelen@sknlaw.com

*Attorneys for Myron Gushlak*

## CERTIFICATE OF SERVICE

I certify that on May 28, 2025, I electronically filed the foregoing document

with the Clerk of the Court using CM/ECF, causing a copy to be served on counsel of

record.

/s/ *Francis D. Murray*
Francis D. Murray